IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CRIM. NO.: 10-cr-0048 |
| v. ) | |
| ) | |
| MYRON FOX ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

Finch, Senior Judge

THIS MATTER is before the Court on Defendant Myron Fox's ("Defendant") Motion to Suppress. During a nighttime "saturation patrol" in a high crime area in downtown Christiansted, St. Croix, police observed Defendant walking down a main thoroughfare. He made eye contact with them and then backed away into one of the many archways than line the streets in Christiansted. Police approached him and ordered him to take his hand out of his pocket. After complying with this command, Defendant turned to walk away, and put his hand back in his pocket. Police then seized his hand, forcibly pulled it out of his pocket, and discovered a firearm in his grip. Defendant was subsequently charged with felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and unauthorized possession of a firearm in violation of 14 V.I.C. § 2253(a). Defendant moves to suppress the firearm and any statements he allegedly made after its discovery on the basis that the firearm was found during an illegal search and/or seizure. The Government opposes the motion and argues that police discovered the firearm during a valid *Terry* stop. The Court held a hearing on Defendant's Motion on March 4, 2011. Because the Government has failed to demonstrate that police had a reasonable,

articulable suspicion that Defendant was engaging in criminal activity, the Court finds that the search and seizure of Defendant was unlawful and Defendant's motion to suppress must be granted.

I. **<u>Findings of Fact</u>**[1]

At approximately 10 p.m. on the night of October 28, 2010, Chief Christopher Howell and Officer Ralston Wright of the Virgin Islands Police Department ("VIPD") were on foot patrol on Company Street in downtown Christiansted in the vicinity of Times Square. Chief Howell and Officer Wright were participating in a "saturated patrol" and were wearing visible bullet proof vests emblazoned with the word POLICE. Two other police units were patrolling approximately one block away. Chief Howell testified that police have made numerous drug seizures and prostitution arrests in the Times Square area and that he had recently executed a search warrant in the area.

Company Street, which runs east to west, is one of two main thoroughfares through downtown Christiansted. Company Street is lined with buildings and sidewalks on both sides. Those sidewalks run below a series of connected stone archways, which are ubiquitous in downtown Christiansted. The Times Square area is at the western end of Company Street. In that area is a police substation, a grocery store and several bars and restaurants.

While walking west on Company Street in the vicinity of Times Square, Chief Howell and Officer Wright observed Defendant walking out of an archway. Defendant made eye contact with them and then backed up into the same "dark" archway that he had just left. Officer Howell shined a flashlight in Defendant's direction and both officers approached him. As they

---

[1] These findings are based on the suppression hearing testimony of Chief Christopher Howell and Officer Ralston Wright of the Virgin Islands Police Department.

2

approached him, they noticed Defendant put his hand into his pocket. One of the officers asked Defendant if there was anything illegal on him to which Defendant responded, "No." The officer also asked Defendant to remove his hand from his pocket. Defendant complied. Defendant turned to walk away and put his hand back in the front pocket of his pants. Chief Howell, who, at this point, was facing Defendant's back, grabbed Defendant's hand and forcibly removed it from his pocket. Chief Howell immediately observed a handgun in Defendant's hand, yelled "Gun!" and wrestled Defendant to the ground where he was subdued and handcuffed.

After being handcuffed, Defendant was asked if he had a license to possess a firearm to which he responded in the negative. Police then brought Defendant to the police station where he was mirandized and booked. During the booking process, Defendant allegedly said, "You should have just killed me," or words to that effect.

## II. Analysis

Fourth Amendment analysis typically proceeds in three stages. First, the Court asks whether a Fourth Amendment event, such as a search or a seizure, has occurred. Next, the Court considers whether that search or seizure was reasonable. If the search or seizure was unreasonable, the Court must then determine whether the circumstances warrant suppression of the evidence. *United States v. Dupree*, 617 F.3d 724, 730 (3d Cir. 2010).

"The Fourth Amendment prohibits unreasonable searches and seizures, and searches without a warrant are presumptively unreasonable." *United States v. Mathurin*, 561 F.3d 170, 173 (3d Cir. 2009) (citations omitted) (internal quotations omitted). "However, under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has held that police can stop and briefly detain a person for investigative

3

purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Id*. at 173-74 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotations omitted)); *see also Dupree*, 617 F.3d at 730 (same). Any evidence obtained pursuant to a *Terry* stop that does not meet this exception must be suppressed as "fruit of the poisonous tree." *Dupree*, 617 F.3d at 730 (quoting *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006)).

"Reasonable suspicion is just that: suspicion that is reasonably based on the totality of the facts and circumstances. It is a belief that has been defined as 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Mathurin*, 561 F.3d at 174 (quoting *Ornelas v. United States*, 517 U.S. 690, 693 (1996)). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion...." *Id*.

In determining whether police had reasonable suspicion sufficient to support a *Terry* stop, courts are instructed to consider "the totality of the circumstances." *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (citation omitted). Relevant factors include, but are not limited to: (1) presence of a suspect in a high crime area; (2) a suspect's presence on a street at a late hour; (3) a suspect's "nervous, evasive behavior" or flight from police; (4) a suspect behaves in a way that conforms to police officers' specialized knowledge of criminal activity. *Brown*, 448 F.3d at 251 (citing cases). "Though the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they 'must serve to eliminate a substantial portion of innocent travelers.'" *Mathurin*, 561 F.3d at 174 (quoting *Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir. 1995)).

4

Here, the Government acknowledges that the officers seized Defendant, but argue that the seizure was a lawful *Terry* stop.[2] The Government argues that it had reasonable suspicion based on the facts that Defendant was found in a high crime area at a late hour of the night and fled from police. Defendant argues that his conduct does not amount to "flight" and that his mere presence on Company Street at night in an area near restaurants and bars cannot reasonably be considered suspicious.

Under the totality of the circumstances and facts known to Chief Howell and Officer Wright, the Court concludes that they lacked a reasonable, articulable suspicion for seizing Defendant. First, while it is reasonable to consider the intersection of Company Street and Times Square a high crime area, "[m]ere presence in an area known for high crime does not give rise to reasonable suspicion for a stop." *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) (citing *Brown v. Texas*, 443 U.S. 47, 52 (1979)). Furthermore, the Times Square area contains a number of bars and restaurants. The Court is aware that bars and restaurants throughout downtown Christiansted frequently stay open past 10 p.m. Many law abiding citizens perambulate to and from these bars and restaurants at night. Thus, Defendant's mere presence at 10 p.m. on the western end of Company Street, an arguably high crime area, does not "eliminate a substantial portion of innocent travelers," and is not a particularly strong gauge that

---

[2] There can be no question that Defendant was seized. That seizure occurred when Defendant first removed his hand from his pocket, in submission to the officers' show of authority. *See California v. Hodari D.*, 499 U.S. 621, 626-28 (1991) (finding that seizure occurs when a person submits to a police "show of authority" and that "the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."). The issue is whether police had reasonable suspicion up to that point. *Brown*, 448 F.3d at 245 ("[W]e must consider only the facts available to the officer at the moment of the seizure.") (quoting *Terry*, 392 U.S. at 21-22).

"criminal activity is afoot." *Mathurin*, 561 F.3d at 174.[3] Moreover, police did not provide any link between the location and time of night with any alleged criminal activity by *defendant*. On the whole, the location and timing of where police observed Defendant are not particularly strong facts in support of reasonable suspicion.

The Court now considers what effect Defendant's conduct has on the reasonable suspicion calculus. The substance of the officers' testimony was that Defendant made eye contact with them at some distance as he was walking from out of an archway; that upon seeing them (and their POLICE vests), Defendant retreated back into the shadows from whence he came; that when officers approached him, he put his hand in his pocket; that when asked by them, denied having anything illegal on him; that he complied with their command to remove his hand from his pocket; and that he turned to walk away and put his hand back in his pocket.

The Court finds that this conduct, in combination with the other facts discussed above, was insufficient to provide the police officers with reasonable suspicion that criminal activity was afoot. First, Defendant's retreat into the archway was not "flight" as that term is used in the reasonable suspicion analysis. In *Illinois v. Wardlow*, the Supreme Court held that a suspect's "headlong flight" from police in a high crime area provided police with sufficient reasonable suspicion to stop and frisk him. 528 U.S. 119, 124-25 (2000). This "headlong flight" occurred when the suspect "looked in the direction of the officers and fled . . . [police] watched him as he *ran* through the gangway and an alley…" *Id*. (emphasis added). But here, Defendant is not

---

[3] The Court also notes that cases discussing the "late hour of the night" factor generally involve situations much later that 10 p.m. *See, e.g. Valentine*, 232 F.3d 350 (defendant "was walking around at 1:00 a.m. in a high-crime area known for shootings"); *United States v. Nelson*, 284 F.3d 472, 475 (3d Cir. 2002) (car pulled over at 1:00 a.m.). That distinction bears some relevance here because there are significantly more people out on the streets at 10 p.m. in downtown Christiansted than there are at 1:00 a.m.

6

alleged to have run away, but merely back up several feet when he first saw police and then attempt to *walk* away after being briefly questioned. This does not "headlong flight" make. *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("Walking away from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area."); [4] *Johnson v. Campbell*, 332 F.3d 199, 208 (3d Cir. 2003) ("[A]n individual 'has a right to ignore the police and go about his business' without that activity being deemed inherently suspicious.") (citing *Wardlow*, 528 U.S. at 125).

Second, Defendant's conduct can hardly be considered the sort of "nervous, evasive behavior" present in other situations justifying reasonable suspicion. *See Wardlow*, 528 U.S. at 120. Neither officer's recounting of the facts indicates that Defendant objectively appeared nervous. *See Givan*, 320 F.3d at 459 (finding facts that defendant "appeared nervous and fidgety and was talking often and shuffling his feet" contributed to reasonable suspicion); *United States v. Silveus*, 542 F.3d 993, 998 (3d Cir. 2008) (holding that presence of "nervous, scared, and disoriented" passengers in defendant's car supported reasonable suspicion to expand scope of traffic stop); *United States v. Mayo*, 361 F.3d 802, 807-808 (4th Cir. 2004) (finding reasonable suspicion when defendant "evinced an unusually nervous behavior. He averted his eyes to avoid those of the officers, and his nervousness was palpable."); *United States v. Turnbull*, 2011 WL 578831, at *3 (D.V.I. Feb. 9, 2011) (Finch, J.,) (finding fact that "Defendant continued to breathe

---

[4] Other Third Circuit cases demonstrate that "flight" means to *run* away. *See Bonner,* 363 F.3d at 218 (finding that police had reasonable suspicion to seize defendant when he ran from car during routine traffic stop despite repeated orders to stop); *United States v. Brown*, 159 F.3d 147, 150 (3d Cir. 1998) (finding that police had reasonable suspicion to stop defendant when he was walking away from an area where police had recently received a report of a shooting, disregarded the officer's request to "hold up," continued walking, and then "ran away and attempted to elude [police] by ducking into an alleyway and a bar.").

7

extremely heavily during the stop and appeared nervous" supported reasonable suspicion to expand scope of traffic stop).

Third, Defendant's hand movements in these circumstances – putting his hand in his pocket on two occasions – is simply too innocent and normal of a behavior to signal that criminal activity may have been afoot. Cases relying on the placing of hand in a pocket as a basis for reasonable suspicion involve facts showing that it was linked to potential criminal conduct. *See, e.g., United States v. Whitfield*, __F.3d.__, 2010 WL 4925876, at *3 (3d Cir. 2010) (finding reasonable suspicion when defendant appeared to engage in a hand-to-hand exchange with another individual, walked away from police, inserted his hand in his pocket "in an effort to conceal something," and refused to stop or show hands to police); *United States v. Paulette*, 457 F.3d 601, 602, 606 (6th Cir. 2006) (finding reasonable suspicion when defendant who had just engaged in a hand-to-hand transaction in a high-crime area "quickly moved his hand to his pocket and began to walk away from the officers" upon noticing their approaching squad car); *Mayo*, 361 F.3d at 807 ("Mayo's activity upon viewing the marked patrol car suggested that he might be carrying a gun. The way Mayo put his hand in his pocket and the appearance of something heavy in his pocket suggested to the officers that Mayo had put his left hand onto a gun to protect it while he was moving."); *see also United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) (finding that defendant's "furtive" movements – leaning back, shoving something down toward his waist, and then raising and lowering his hands several times before finally keeping them in the air as instructed – formed partial basis for reasonable suspicion). Here, there was no testimony that Defendant was hiding evidence, that he had a bulge in his pants pocket, or that he had just been seen engaging in suspicious conduct. Rather, he simply put his hand in his

pocket as police approached. Furthermore, unlike in *Whitfield*, Defendant removed his hand from his pocket when ordered to by police.[5]

Fourth, neither officer testified that they suspected Defendant of being involved in any specific criminal activity; thus, it is entirely unclear what criminal activity in which police suspected Defendant of being involved. *Johnson,* 332 F.3d at 208 ("[T]he activity of which the detainee is suspected must actually be *criminal*.") (emphasis in original). There was no testimony that, in their experience as law enforcement officers, Defendant's conduct was consistent with drug trafficking, prostitution, gun possession, or any other criminal conduct. *See, e.g. Whitfield*, __F.3d.__, 2010 WL 4925876, at *3 (finding reasonable suspicion when defendant appeared to engage in a hand-to-hand exchange with another individual and then inserted his hand in his pocket "in an effort to conceal something."); *United States v. Coggins*, 986 F.2d 651, 654 (3d Cir. 1993) (finding that officer has reasonable suspicion to seize defendant because, in part, he "match[ed] with the 'standard profile' for drug couriers"); *Mayo*, 361 F.3d at

---

[5] In its brief, the Government asserts that *United States v. Simmons*, 560 F.3d 98 (2d Cir. 2009) supports a finding of reasonable suspicion. In *Simmons,* police received an anonymous tip that an assault was being committed at an apartment building in a high crime area. *Id*. at 101. The caller indicated that the suspect was a black male wearing a grey hoody and a black jacket. Police went to the building and, in the apartment building lobby, observed an individual who matched the caller's description. The individual began walking towards police and they ordered him to stop. After the second order, he complied and they asked him to remove his hands from his pockets. He did not remove his hands. After a second ignored command, an officer grabbed the individual's pocket and felt the butt of a gun. The defendant moved to suppress the gun on the grounds that police lacked reasonable suspicion to stop him. In a "close case," the Second Circuit found that police had reasonable suspicion to stop him because he matched the description given by the caller and his conduct "could have suggested to the officers that Simmons was concealing a weapon, especially since the dispatcher reported that the suspect may have perpetrated an assault with a weapon based on information in the 911 call." *Id*. at 107-108. In sharp contrast, here, Defendant had not been identified as a suspect in a crime and there was therefore no reason for police to suspect that he had a weapon in his pocket. Additionally, even though he did not have to, Defendant complied with the order to remove his hand from his pocket. Accordingly, *Simmons* is inapposite and does not support a finding of reasonable suspicion in these circumstances.

9

807 ("The way Mayo put his hand in his pocket and the appearance of something heavy in his pocket suggested to the officers that Mayo had put his left hand onto a gun to protect it while he was moving."). It appears as though Defendant was stopped merely for looking suspicious in a high crime area at night. That is an insufficient basis for a *Terry* stop.

Finally, the Court notes that the facts urged in support of reasonable suspicion by the Government in this case would cast a net wider than allowed by the Constitution. *See Mathurin*, 561 F.3d at 174 (facts supporting reasonable suspicion must "eliminate a substantial portion of innocent travelers"). Anyone observed at night on Company Street in the vicinity of Times Square (or in any other high crime area of which there are a number of on St. Croix) would be subject to a *Terry* stop if they backed away from police whilst putting their hands in their pockets. In *Terry*, the Supreme Court attempted to balance "the neutralization of danger to the policeman in the investigative circumstance and the sanctity of the individual." *Terry*, 392 U.S. at 26. A finding of reasonable suspicion here tilts that balance too far away from the fundamental right to be free from unlawful seizures. The Constitution requires more. The seizure of Defendant was unlawful and the firearm found on his person must be suppressed.[6]

---

[6] Defendant also moved to suppress any statements he may have made to police following his seizure and ultimate arrest. The Government concedes that it may not use Defendant's unwarned statement that he did not have a license for the gun. The Government also agrees that his later statement – "you should have just killed me" – is irrelevant to the charges brought against him. In any event, because the seizure of Defendant was unlawful, any statements obtained as a result of that seizure are "the fruit of the poisonous tree" and must also be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

## III. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Suppress. Accordingly, it is hereby **ORDERED** that

Defendant's Motion to Suppress is **GRANTED**.

ENTERED:

Dated: March 8, 2011

_____/s/_____
RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE